17-1699
USA v. DiTomasso

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued:  January 23, 2019                    Decided: July 30, 2019)

Docket No. 17-1699

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

FRANK DiTOMASSO,

*Defendant-Appellant*.

_____

Before:  KEARSE, JACOBS, and SACK, *Circuit Judges*.

Appeal from a judgment entered in the United States District Court for the Southern District of New York, Valerie E. Caproni, *Judge*, convicting defendant, following a jury trial before then-*Judge* Shira A. Scheindlin, of producing child

pornography, in violation of 18 U.S.C. §§ 2251(a) and (e), and transporting and distributing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and (a)(2)(B). On appeal, defendant contends principally that the district court erred in denying his pretrial motion to suppress certain electronic communications found through searches, allegedly without his consent, by two internet service providers and by the National Center for Missing and Exploited Children, allegedly a government actor for Fourth Amendment purposes, *see* 56 F.Supp.3d 584 (2014); 81 F.Supp.3d 304 (2015). He also contends that he was entitled to a hearing on his posttrial motion for a new trial on the ground of ineffective assistance of counsel, based on his attorney's failure to call as a witness defendant's uncle who allegedly would have testified that he, and not defendant, was guilty of the offense conduct. We find no merit in defendant's contentions.

Affirmed.

KIMBERLY J. RAVENER, Assistant United States Attorney, New York, New York (Geoffrey S. Berman, United States Attorney for the Southern District of New York, Margaret Graham, Anna M. Skotko, Assistant United States Attorneys, New York, New York, on the brief), *for Appellee*.

THOMAS EDDY, New York, New York (Lori Cohen, Law Offices of Lori Cohen, New York, New York, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Frank DiTomasso appeals from a judgment entered in the United States District Court for the Southern District of New York, Valerie E. Caproni, *Judge*, convicting him, following a jury trial before then-*Judge* Shira A. Scheindlin, of producing child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e), and of transporting and distributing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1) and (a)(2)(B). DiTomasso was sentenced principally to 25 years' imprisonment, to be followed by a life term of supervised release. On appeal, he contends principally that the district court erred in denying his pretrial motion to suppress certain of his electronic communications found through searches, allegedly without his consent, conducted by two Internet Service Providers ("ISPs")--America Online ("AOL") and Omegle.com LLC ("Omegle")--and by the National Center for Missing and Exploited Children ("NCMEC"), which he asserts is a government actor for purposes of the Fourth Amendment. He also contends that the court abused its discretion in denying, without a hearing, his motion for a new trial on the ground of ineffective assistance of counsel, based on his attorney's failure to call as a witness DiTomasso's uncle who allegedly would have testified that he, and not DiTomasso, was guilty of the offense conduct. Finding no merit in DiTomasso's contentions, we affirm.

# I. BACKGROUND

Every computer that communicates with an internet network is assigned a unique Internet Protocol ("IP") address. *See generally United States v. Bershchansky*, 788 F.3d 102, 105 n.2 (2d Cir. 2015). An IP address contains information with regard to, *inter alia*, the geographic location from which a device connects to the internet, although it does not identify the person using the device. ISPs may have additional information showing the identity of a person associated with a given IP address.

NCMEC is a private, nonprofit corporation, which aims to reunite families with missing children, reduce child sexual exploitation, and prevent the victimization of children. It maintains an initiative whereby individual persons and ISPs can report to NCMEC on a range of internet-based misconduct, including the apparent presence of child pornography. ISPs that "obtain[] actual knowledge" of unlawful conduct involving child pornography are required by § 2258A of Title 18 of the United States Code to report that conduct to NCMEC, 18 U.S.C. § 2258A(a), and they face substantial fines if they fail to do so, *see id*. § 2258A(e). However, the statute provides that "[n]othing in this section shall be construed to require a[n ISP] . . . to . . .

4

monitor any user," to monitor the "content of any [user] communication," or to "affirmatively seek facts or circumstances" involving child pornography violations, *id*. § 2258A(f). Once child pornography conduct has been reported to NCMEC, NCMEC is required to "forward" any such report to law enforcement. *Id*. § 2258A(c)(1).

A. *The Offense Conduct in this Case*

The evidence at DiTomasso's March 2016 trial, viewed in the light most favorable to the government, included the following. In March 2013, law enforcement agents in Florida received a report from NCMEC, forwarding a complaint from "Dropbox," an internet file-sharing service that allows users to store files in online data centers and allows anyone to access them on any computer by signing into the user's account with the user's password. Dropbox complained that someone at a specified IP address, using a specified email address and a specified pseudonym as a user name, had been uploading child pornography to the internet. The Dropbox complaint attached several files, including an image of female breasts, and two images of a vagina from different vantage points.

5

Sergeant Richard Heaton of the sheriff's office in Pinellas County, Florida, sent a subpoena to the network that issued the specified IP address and obtained information as to, *inter alia*, the customer's name, email address, telephone number, and street address. The local law enforcement database indicated that the residents at that street address in 2013 were a mother, her adult son, and her daughter.

Based on the pseudonym that had been adopted as the user name on the Dropbox account, the authorities inferred that the person uploading child pornography to the Dropbox account was the daughter--who at trial was referred to by the pseudonym "Sarah." In August 2013, Heaton went to the address in question, saw Sarah, who appeared to be about 13 or 14 years old (DiTomasso and the government stipulated that Sarah was born in 1999), and interviewed the mother. After the mother learned why Heaton was there, she gave permission for a forensic examination of Sarah's computer.

Heaton and other State experts examined the computer and found on it child pornography, including the same pictures of breasts and vagina that had been sent to NCMEC by Dropbox, along with another picture of breasts and a video of a female masturbating. The parties stipulated that the pictures and the video depicted Sarah and that they had been made by Sarah.

The computer also contained logs of chats on "Skype"--an internet program that allows users to communicate with one another via text messages and/or video conferences--between Sarah and a "Frankie" whose Skype name was "frankiepthc." The letters "PTHC" as used on the internet are understood to stand for preteen hard-core, a type of child pornography. (*E.g.*, Trial Transcript ("Trial Tr.") 197.) Sarah's computer contained transcripts of Skype conversations in which frankiepthc had, *inter alia*, asked to see Sarah "head to toes naked," and evidence that in response to such a request in February 2013, Sarah that day uploaded to her Dropbox account still images of herself nude, and the next day uploaded a video of herself nude and masturbating.

There was abundant evidence that frankiepthc was in fact DiTomasso. First, frankiepthc's Skype profile as revealed on Sarah's computer said that his birth date was September 21, 1979, his residence was in Manhattan, New York, and his telephone number was 1 646-530-6864 (the "6864 telephone number"). The frankiepthc Skype account accessed the internet from an IP address for an account that was subscribed to by Frank DiTomasso in Manhattan, at 2252 First Avenue, Apartment 3A, New York, New York; and the 6864 telephone number was registered to DiTomasso.

Second, the parties stipulated that DiTomasso had previously pleaded guilty to and been convicted of attempted possession of an obscene sexual performance by a child under the age of 16 years. (At trial in this action he testified that he had in fact been innocent.) DiTomasso was thus a registered sex offender. The birth date shown on his sex offender registration was September 21, 1974; and his address on file with the New York State Sex Offender Registry was 2252 First Avenue, Apartment 3A, New York, New York ("DiTomasso's Residence" or the "First Avenue Apartment").

Further, the Skype frankiepthc account had provided "frankieinnyc1@aol.com" as a related email address, an AOL account that DiTomasso at trial admitted was his, set up by him (*see* Trial Tr. 735-36). An account associated with "frankieinnyc1@aol.com" stated that the user was named "Frankie," was Italian, was 6'1", weighed 160 pounds, and had brown hair and green eyes. DiTomasso's sex offender registration described him as Italian, 6'1", 165 pounds, with brown hair and green eyes.

When DiTomasso was arrested, an Xbox--a computing device capable of connecting to the internet--was seized from his residence. Forensic analysis revealed that the Xbox had been used to search for child pornography and to access,

8

*inter alia*, Skype, Dropbox, AOL, and Omegle. The government introduced three complaints that Omegle had sent to NCMEC, flagging a user at an IP address assigned to DiTomasso's Residence for displaying child pornography to other users in videochats. The government introduced multiple NCMEC reports containing screenshots of child pornography transmitted by a user accessing the internet from an IP address associated with DiTomasso's Residence; several of the screenshots were overlaid with a smaller picture-in-picture image of a naked man masturbating. DiTomasso conceded that he was that man and had so photographed himself (*see* Trial Tr. 722-23), although he denied having had anything to do with joining his photo with the pictures of child pornography.

In appealing his conviction, DiTomasso does not challenge the sufficiency of the evidence or any aspect of the court's conduct of the trial. Rather, he principally claims that his pretrial motion to suppress evidence of his emails and chats should have been granted.

B. *DiTomasso's Motion To Suppress*

In December 2013, after the Florida authorities had examined Sarah's computer and seen that frankiepthc's Skype account linked him to a New York

9

address, Heaton had contacted the local FBI office in Florida; that office contacted the FBI office in New York City, which led the remainder of the investigation. The New York FBI agents learned of, *inter alia*, DiTomasso's conviction in 2010 as a sex offender and learned from his probation officer that DiTomasso resided in Manhattan at 2252 First Avenue, Apartment 3A.

The agents learned from the New York City Police Department that since August 2012, AOL had twice sent NCMEC complaints of suspected receipt of child pornography by the address "frankieinnyc1@aol.com"--which were recorded in NCMEC reports numbered 1558963 and 1560137--and had twice informed NCMEC of user complaints of sexually explicit messages referring to child abuse and child pornography sent by that account. The agents also learned that on three occasions between November 2012 and December 2013, Omegle's monitoring system had flagged a user at an IP address associated with DiTomasso's Residence for displaying child pornography to other users via video chat.

In January 2014, Sarah was interviewed by law enforcement agents in Florida. During these sessions, she said she had met an individual named "Frankie" on the social networking site Omegle; that she had communicated with "Frankie" using the internet program Skype; and that "Frankie's" Skype username was

"frankiepthc." Sarah said she had told "Frankie" she was a minor during at least one Skype chat session. The Skype transcripts on Sarah's computer revealed that her chats with "Frankie" began in October 2012 and continued into February 2013 (*see* Government Exhibit ("GX") 706), and that Sarah had told "Frankie" in November that she was under the age of 14 (*see*, *e.g.*, *id*. at 6-7).

Sarah told the agents that during multiple chat sessions, "Frankie" had directed her to engage in various forms of sexually provocative behavior, such as revealing her genitals and using foreign objects to penetrate her genitals; that "Frankie" had instructed her to produce and upload to her Dropbox account sexually explicit images and videos of herself; and that "Frankie" had helped her to find and download child pornography on the internet, which she later uploaded to her Dropbox account.

The Skype calls that Sarah received from "frankiepthc" were calls using Skype's video function. At one interview session, the agents showed Sarah photo arrays; from the array containing a picture of DiTomasso, she positively identified him as "Frankie."

In January and February 2014, the government obtained warrants to search the AOL account "frankieinnyc1@aol.com," the Omegle chat records for the

11

user with an IP address associated with DiTomasso's Residence, and DiTomasso's Residence itself. The affidavits accompanying the applications principally cited (a) information gleaned from interviews with Sarah and from her computer, (b) information as to the Dropbox images that had been sent to NCMEC and forwarded by NCMEC to law enforcement, (c) the fact that DiTomasso was a registered sex offender, (d) the reports to NCMEC by AOL or Omegle as to child pornography messages or video chats received, maintained, or disseminated by the account "frankieinnyc1@aol.com" or other IP addresses assigned to DiTomasso's Residence, and (e) additional reports from Omegle of chats containing split-screen depictions of child pornography in one segment of the screen, and in another segment a naked adult male with his hands on his genitals. The search of DiTomasso's Residence turned up, *inter alia*, the Xbox referred to in Part I.A. above, as well as hardware that allows users to connect to the internet. Execution of that warrant also revealed certain displays in DiTomasso's Residence that were consistent with holiday decorations that had been described by frankiepthc in a Skype conversation with Sarah.

In March 2014, a grand jury returned an indictment charging DiTomasso with production, transportation, and distribution of child pornography, in violation of 28 U.S.C. §§ 2251(a), 2252A(a)(1) and (a)(2)(B) (a superseding indictment with the

12

final charges was filed in January 2016). In August 2014, DiTomasso moved to suppress the contents of electronic communications and all other evidence obtained through AOL searches of the "frankieinnyc@aol.com" [*sic*] account and Omegle searches of an IP address specified in the January warrant, as violative of his rights under the Fourth Amendment. He contended as a matter of law, submitting no sworn factual allegations, that he had a reasonable expectation of privacy in the contents of the emails and chats he had sent or received over AOL and Omegle; that those ISPs through their respective monitoring systems, had conducted warrantless searches of his communications; and that, in so doing, AOL and Omegle had acted as agents of the government. He also sought suppression of any evidence obtained through subsequent FBI searches, as fruit of the poisonous tree(s).

The government opposed the motion on various grounds, arguing, *inter alia*, that DiTomasso had no reasonable expectation of privacy in his electronic communications; that, in any event he had consented to the searches because the AOL terms of use and the Omegle privacy policy advised users that communications were monitored and could be turned over to law enforcement; that Omegle monitored chats to protect its pecuniary and reputational interests and did not act as a government agent in conducting those searches; and that, even if all of the

13

information obtained from the AOL and Omegle searches were excised, the search warrant applications presented probable cause to support the warrants' issuance. In support of its contentions, the government submitted, *inter alia*, declarations of officials from AOL and Omegle.

Based on the parties' written submissions, the district court, in an Opinion and Order dated October 28, 2014, reported at 56 F.Supp.3d 584 ("2014 Opinion"), denied so much of DiTomasso's motion as sought suppression of the search of his AOL emails but ordered further briefing and a hearing as to Omegle.

1. *AOL*

As to AOL's operations and terms of use, the district court made the following findings, which are not disputed. When AOL users send or receive emails containing attachments, AOL runs monitoring systems to scan for illicit material, including child pornography. Essentially, these systems look either for images that exactly match a known child pornography image or for images that are sufficiently similar to such images. If an attached file is an exact match, AOL automatically generates a report that is sent to NCMEC; if an attached file is similar to a known pornographic image but not an exact match, an AOL employee reviews the flagged

file and, if the employee determines that the file does in fact contain child pornography, a report is sent to NCMEC.

Using these monitoring methods, AOL in August 2012 identified two emails (the "challenged searches") addressed to "frankieinnyc1@aol.com" that attached files containing child pornography. These two emails led to the AOL complaints that generated NCMEC Reports numbered 1558963 and 1560137.

At the time of AOL's challenged searches, AOL's terms of service, privacy policy, and community guidelines provided, in relevant part, that AOL users must not "post content that contains explicit or graphic descriptions or accounts of sexual acts" (AOL Terms of Service, Ex. I to Government's Memorandum in Opposition to Defendant's Motion[] To Suppress ("Gov. Suppression Mem."), at 1); that if "AOL has a good faith belief that a crime has been or is being committed by an AOL user," the "contents of . . . online communications" may be disclosed by AOL (AOL Privacy Policy, Ex. H to Gov. Suppression Mem., at 2); and that "AOL has zero tolerance for illegal activity on the service" and "reserves the right to take any action it deems warranted," including, but not limited to, "cooperat[ing] with law enforcement" (AOL Member Community Guidelines, Ex. G to Gov. Suppression Mem., at 1-2).

The district court found that AOL had made it clear that it intended actively to assist law enforcement, and that DiTomasso, in using AOL's services, had voluntarily agreed to that practice. Accordingly, although finding that AOL's searches constituted government searches, the court concluded that they did not violate DiTomasso's Fourth Amendment rights because he had consented, and that NCMEC Reports 1558963 and 1560137 would be admissible at trial. *See* 2014 Opinion, 56 F.Supp.3d at 597.

2. *Omegle*

The district court also found that DiTomasso had consented to the monitoring done by Omegle but found it unclear whether that monitoring, like AOL's, was meant to perform a law enforcement function. The court scheduled a hearing for testimony as to the motivation for Omegle's monitoring, *i.e.*, whether its screening of chats was a "private search, outside the bounds of constitutional protection, or whether it was a search carried out at the behest of law enforcement, which would trigger Fourth Amendment scrutiny." 2014 Opinion, 56 F.Supp.3d at 597-98 (internal quotation marks omitted). After a hearing at which Omegle's founder and operating officer testified with regard to the impetus for and contours

16

of Omegle's monitoring policy, the court, in a January 26, 2015 Opinion and Order reported at 81 F.Supp.3d 304 ("2015 Opinion"), rejected DiTomasso's contention that Omegle's monitoring program served no purpose other than to ferret out evidence of criminal activity and thus constituted governmental action, *see id*. at 309-11. The court instead found credible the nongovernmental reasons given for the Omegle policy, and it denied DiTomasso's motion to suppress any Omegle-generated reports, ruling that "Omegle's monitoring constituted a purely 'private search,' beyond the reach of the Fourth Amendment." *Id*. at 306.

C. *Posttrial Proceedings*

Following the jury's verdict finding him guilty of the child pornography crimes charged against him, DiTomasso moved before Judge Caproni, to whom the case had been reassigned following Judge Scheindlin's retirement from the bench, for a new trial. He asserted that his attorney had denied him effective assistance by, *inter alia*, failing to call as a witness DiTomasso's uncle who would have claimed complete responsibility for the offense conduct at issue and thereby exonerated DiTomasso. That motion was denied. (*See* Part II.B. below.)

DiTomasso was thereafter sentenced principally to 25 years' imprisonment--the statutory minimum for a person convicted of production of child pornography after a prior child pornography conviction, *see* 18 U.S.C. § 2251(e)--to be followed by a life term of supervised release. This appeal followed.

## II. DISCUSSION

On appeal, DiTomasso contends principally that the district court erred in finding that the searches of his emails and/or chats by AOL and/or Omegle did not violate his Fourth Amendment rights because DiTomasso had consented to those searches (*see* DiTomasso brief on appeal at 23-34), arguing that the court had no basis for its findings of consent (*see*, *e.g.*, *id*. at 28-32); and he contends that his rights were violated by NCMEC (*see id*. at 35-42). He also contends that he should have been granted a new trial because he received ineffective assistance of counsel. We reject these contentions for the reasons that follow.

A. *Denial of the Suppression Motion*

DiTomasso's appellate Fourth Amendment contentions with respect to AOL, Omegle, and NCMEC are meritless on various grounds.

1. *AOL*

DiTomasso's contention that the district court erred in ruling that NCMEC Reports 1558963 and 1560137, generated from the two AOL complaints resulting from the challenged searches, were admissible based on its finding that DiTomasso had consented to AOL's searching his emails, provides no basis for relief, regardless of whether there was consent, for the searches of those emails played no material role in the proceedings. First, those NCMEC reports--and the AOL complaints on which they were based--were not offered or admitted at trial.

Second, to the extent that DiTomasso argues that even though those complaints were not used at trial they were used to secure search warrants leading to evidence against him, and that the resulting evidence was fruit of the poisonous tree, his argument is also without merit. When "deciding whether probable cause exists for a search warrant, a judge must determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United*

*States v. Salameh*, 152 F.3d 88, 112-13 (2d Cir. 1998) (internal quotation marks omitted), *cert. denied* 526 U.S. 1028 (1999).  This determination requires only "'a *practical, common-sense decision*'" as to that probability, "'given all the circumstances set forth in the affidavit.'"  *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis in *United States v. Martin*)), *cert. denied*, 547 U.S. 1192 (2006).  If a search warrant application contains erroneous or inappropriate information, our question becomes, "after putting aside" the improvidently included information, "whether . . . there remains a residue of independent and lawful information sufficient to support probable cause."  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal quotation marks omitted).  That question is easily answered in the affirmative here.

While DiTomasso suggests that it was the challenged searches by AOL (or Omegle) that "spawned the NCMEC reports on which the investigation and prosecution was [*sic*] based" (DiTomasso brief on appeal at viii; *id*. at 23), the record makes clear that the investigation had gone on for many months before the federal government was aware of the AOL and Omegle complaints to NCMEC.  The NCMEC report leading up to this case was sent to local law enforcement in Florida in March 2013; it relayed a complaint that had been made to NCMEC not by AOL or Omegle

20

but by Dropbox. That report led to Sergeant Heaton's interview of Sarah's mother in August 2013, and the ensuing forensic examination of Sarah's computer by Florida law enforcement. The FBI, which learned of the AOL complaints from New York police, was not involved until December 2013, some nine months after the investigation had begun. It is thus clear that the AOL and Omegle searches did not precipitate this investigation of DiTomasso.

Independent of any complaints to NCMEC by AOL, the search warrant applications, as described in Part I.B. above, cited, *inter alia*, the data found on Sarah's computer, the Dropbox pornographic images of Sarah, the statements Sarah made to the investigators describing her communications and video chats with frankiepthc, Sarah's positive photo identification of DiTomasso as frankiepthc, the fact that DiTomasso was a registered sex offender, and several complaints made to NCMEC by Omegle. Thus, even without consideration of the AOL complaints, the search warrant applications showed probable cause for the issuance of the warrants.

Accordingly, we need not reach the question of whether the district court erred in finding that DiTomasso had consented to AOL's searches of his emails, because if there was any error in the denial of DiTomasso's motion to suppress the AOL-generated NCMEC reports, it was beyond a doubt harmless.

21

2. *Omegle*

DiTomasso also contends that the district court erred in finding that he "'voluntarily agreed to . . . Omegle's policies.'" (DiTomasso brief on appeal at 31 (quoting 2014 Opinion, 56 F.Supp.3d at 596).) However, that quoted fragment misrepresents the court's rationale for denying the motion to suppress the Omegle-generated NCMEC reports. As to Omegle, the court said

> there is no question that DiTomasso voluntarily agreed to . . . Omegle's policies. The only question is *what* he consented to by doing so,

2014 Opinion, 56 F.Supp.3d at 596 (emphasis in original), and scheduled further proceedings, saying that, on the record as it stood, "I *cannot* conclude that" the Omegle searches were conducted "*in a law enforcement capacity,*" *id*. (emphases added).

Fourth Amendment principles governing searches and seizures apply only to "governmental action" and are thus "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (internal quotation marks omitted). A "search conducted by private individuals at the instigation of a government officer or authority" may sometimes be attributable to the government

"for purposes of the Fourth Amendment," *Cassidy v. Chertoff*, 471 F.3d 67, 74 (2d Cir. 2006); but private actions are generally "attributable to" the government only where "there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself," *United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) (internal quotation marks omitted). The requisite nexus is not shown merely by government approval of or acquiescence in the activity, or by the fact that the entity is subject to government regulation. "'The purpose of the [close-nexus requirement] is to assure that constitutional standards are invoked only when it can be said that the [government] is *responsible* for the specific conduct of which the [accused] complains.'" *Id*. at 146-47 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in *Blum*)); *see, e.g.*, *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) ("Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities . . . .").

The need to determine whether Omegle conducted its searches as an agent or instrument of the government was what led the district court to order a hearing to receive testimony from Omegle's founder and operating officer as to

23

Omegle's monitoring motivations. *See* 2014 Opinion, 56 F.Supp.3d at 597-98. After considering that testimony, the court ruled that "Omegle's monitoring constituted a purely 'private search,'" and was therefore "beyond the reach of the Fourth Amendment," 2015 Opinion, 81 F.Supp.3d at 306.

Thus, the motion to suppress the Omegle-generated reports was denied on the private-search basis alone. That rationale is not challenged in DiTomasso's brief on appeal, and we accordingly do not disturb the court's decision.

3. *NCMEC*

Finally, on appeal, DiTomasso argues that NCMEC is a government actor whose review of his AOL emails and Omegle chats--after AOL and Omegle had submitted their respective reports to NCMEC--violated his Fourth Amendment rights by exceeding the scope of the AOL and Omegle searches. (*See* DiTomasso brief on appeal at 35-42.) In so arguing, DiTomasso relies on decisions in *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) ("*Ackerman*") and *United States v. Keith*, 980 F.Supp.2d 33 (D. Mass. 2013) ("*Keith*"), which found that NCMEC had conducted searches that exceeded the scope of the searches conducted by the reporting ISP, *see*

24

*Ackerman*, 831 F.3d at 1306, or had "expanded the review by opening the file and viewing (and evaluating) its contents," *Keith*, 980 F.Supp.2d at 43.

However, DiTomasso did not argue in the district court that NCMEC had engaged in such conduct with respect to the AOL and Omegle complaints at issue here. While he claims on appeal that he did make such an argument, he acknowledges that his "notice of motion failed to formally denominate . . . []NCMEC[] as an independent actor in the warrantless searches" (DiTomasso brief on appeal at 3). He argues that the issue of whether NCMEC was a government actor was raised in his suppression motion memorandum because "Appellant headed his first point 'The Information That AOL And Omegle Included *In the Cyber Tips They Sent To NCMEC* Was Constitutionally Protected From Disclosure.'" (*Id*. (quoting DiTomasso Memorandum of Law in Support of Motion To Suppress ("DiTomasso Suppression Mem.") at 3 (emphasis in brief on appeal)).) But that heading itself does not suggest that there was any search by NCMEC, or that NCMEC was a government actor. And the argument made in that first section contains no mention whatever of NCMEC. The only other place that DiTomasso's brief on appeal cites as having raised an issue as to the status of NCMEC in the district court is a sentence that the brief says "argu[es] that '. . . the ISPs *and NCMEC* certainly qualify as the *agents and instruments*

25

of the government'" (DiTomasso brief on appeal at 3 (quoting DiTomasso Suppression Mem. at 12 (emphases in brief on appeal)).  But that sentence contains no factual representations as to acts by NCMEC and is buried in a section of DiTomasso's memorandum called "The Searches By The ISPs Constitute Government Action" (DiTomasso Suppression Mem. at 7).

Unsurprisingly, given these perfunctory references to NCMEC, the district court made no ruling with respect to whether NCMEC, after receiving the complaints from AOL and Omegle, had engaged in any search of its own, or had opened the files they received and reviewed or evaluated the contents, or had acted as a government agent.  And equally unsurprisingly, given DiTomasso's lack of any apparent serious focus on NCMEC, DiTomasso did not move for reconsideration to suggest that the court had overlooked any significant issue.

DiTomasso having made no effort in the district court to develop a record as to any conduct by NCMEC other than its forwarding of reports to law enforcement, there is no foundation for his appellate contention that there was action by NCMEC that violated his Fourth Amendment rights.

* * * * *

26

In sum, DiTomasso has proffered no viable basis for disturbing the district court's denial of his motion to suppress.

B. *DiTomasso's Ineffective-Assistance-of-Counsel Claim*

DiTomasso's trial ended in March 2016. In May, DiTomasso sent a handwritten letter to the district court alleging misrepresentations at trial by the government and complaining that his attorney lacked sufficient knowledge as to, *inter alia*, the capability of an Xbox to access Skype. The district court had the letter docketed as a motion for a new trial, granted a request by DiTomasso's attorney to be relieved as counsel, appointed new counsel for DiTomasso, and set a schedule for the filing of posttrial motions. Thereafter, represented by new counsel, DiTomasso formally moved pursuant to Fed. R. Crim. P. 33 for a new trial, contending that he had been denied constitutionally effective assistance of counsel.

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The discretion so conferred should be used "sparingly," and only "in the most extraordinary circumstances"; the "ultimate test on [such a] motion is whether letting

27

a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).

In order to succeed on a claim that he has been denied constitutionally effective assistance of counsel, the defendant must show both (a) "that counsel's representation fell below an objective standard of reasonableness" and (b) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Trial counsel's "[a]ctions or omissions . . . that might be considered sound trial strategy," including decisions not to "call specific witnesses--even ones that might offer exculpatory evidence--[are] ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks omitted), *cert. denied*, 532 U.S. 1007 (2001).

We review *de novo* the issues of whether the defendant has met the two prongs of the *Strickland* test; we review the district court's ultimate decision on a Rule 33 motion for abuse of discretion. *See, e.g.*, *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007). We also review for abuse of discretion the court's decision as to the extent to which a hearing on a Rule 33 motion is needed. *See generally United States v. Forbes*, 790 F.3d 403, 406, 411 (2d Cir. 2015).

28

DiTomasso in his Rule 33 motion, to the extent pertinent to this appeal, contended that he was denied constitutionally effective assistance because his attorney failed to call Robert Marcus, DiTomasso's uncle, as a witness at trial, asserting that Marcus "could have not only corroborated Mr. DiTomasso's trial testimony, but was willing to exonerate Mr. DiTomasso under oath at trial." (DiTomasso Memorandum in Support of Motion for a New Trial at 19.) In support of this contention, DiTomasso submitted an affirmation from his uncle that stated in pertinent part as follows:

> 10. *When I was in the First Avenue Apartment*, I had *full* access to the Xbox and regularly . . . access[ed] the internet on a number of devices . . . .

> 11. I also had *regular* access to email and other *internet accounts that I had set up and helped set up in Frank's name. I . . . regularly accessed and used accounts in Frank's name to access the internet.* I never thought that my online activities would come back to harm Frank.

> . . . .

> 13. *When . . . discovery was provided to [DiTomasso's attorney] and Frank, it became very obvious to both Frank and me that I had to come forward and let someone know that I was the one who engaged in the conduct*, not Frank. . . .

> . . . .

15. I contacted Frank's attorney, Lee Ginsberg. *I informed him that Frank did not commit these crimes. I told Mr. Ginsberg that I was the person responsible for these crimes, not Frank.* Mr. Ginsberg never asked me any questions, never made any inquiry into the how or why of my actions; he just brushed me aside. . . .

. . . .

20. After Frank's testimony, I wanted to testify, but Mr. Ginsberg told me he would not put me on the stand.

(Affirmation of Robert Marcus dated September 12, 2016 ("Marcus Aff."), ¶¶ 10, 11, 13, 15, 20 (emphases added); *see also id*. ¶ 21 ("I told Frank what I would say and I am sure that Frank told Mr. Ginsberg that I was going to accept full responsibility").)

In opposition to this motion, the government submitted, *inter alia*, a declaration from DiTomasso's trial counsel Ginsberg, denying that Marcus had either said he was guilty or said he wanted to so testify at trial. Ginsberg stated in part as follows:

33. *Beginning in July of 2014 and continuing through June of 2016*, counsel [was] . . . in almost daily communication with Robert Marcus . . . [regarding] every aspect of Mr. DiTomasso's defense . . . .

. . . .

35. Shortly after counsel's appointment . . . Mr. DiTomasso began to claim that the Government had planted evidence in his apartment . . . . [A]round October of 2015, Mr. DiTomasso began

to tell counsel . . . that if someone was responsible for the criminal activity, it was Mr. Marcus.

36. Subsequently, Mr. Marcus began asking counsel *hypothetical questions* regarding what would happen if he "came forward." Counsel advised him that it was my belief that the Government would continue to prosecute Mr. DiTomasso . . . .

37. Counsel also advised Marcus that he should have his own attorney. . . .

38. Shortly thereafter, . . . [an attorney] was appointed to represent Mr. Marcus. . . . [Marcus's attorney] advised [Marcus] that because he was now represented all communication should go through [his attorney]; this advice was disregarded by Mr. Marcus.

39. *At no point* after the appointment of [Marcus's attorney] . . . *did Mr. Marcus state either that he was the true culprit or that he wished to testify. Mr. Marcus* would periodically ask what effect his "coming forward" *would* have . . . but *never expressed an actual desire to "come forward" nor did he state that he committed the crimes for which Mr. DiTomasso was charged.*

. . . .

41. Based on conversations counsel had with Mr. Marcus and Mr. DiTomasso and a review of phone calls between the two, counsel was made aware that Mr. DiTomasso believed he would be freed if his uncle took responsibility for these activities and that he was pressuring Mr. Marcus to "come forward," which Mr. Marcus refused to do . . . .

. . . .

31

44. *Mr. Marcus, who sat through the entire trial, never told counsel he wished to testify nor did counsel tell Mr. Marcus that I refused to put him on the stand.* . . . Mr. Marcus's affirmation, in large part, is false . . . and simply an attempt to obtain a new trial for Mr. DiTomasso based upon *events that never occurred*.

(Affidavit of Lee Ginsberg filed January 19, 2017, ¶¶ 33, 35-39, 41, 44 (emphases added).)

In addition, the government pointed to a telephone conversation between DiTomasso and Marcus while DiTomasso was in jail awaiting trial, which had been played for the jury at trial. In the following exchange, when DiTomasso proposed to place all blame on Marcus, Marcus showed no inclination to agree:

DiTomasso: If I have to testify . . . I basically have to you know say, how can I put this, there's no easy way to put this, that I basically have to try to say as much bad about you as possible.

Marcus: . . . *I don't think that would be a good idea.*

(Government Memorandum in Opposition to Motion for a New Trial at 18 (emphasis added); *see* Trial Tr. 786-87.)

At the hearing on DiTomasso's Rule 33 motion, the government also noted that in the final pretrial conference in 2016, a week before the then-scheduled start of trial, when DiTomasso requested an adjournment so that Marcus would be able to attend, the court denied the request, saying

32

"'He is not a necessary witness. I realize he's family support, but it is not as if this is the key witness in the trial. In no way has anybody told me this is a key witness.'"

(Hearing Transcript, April 21, 2017 ("Rule 33 Motion H.Tr."), at 6 (quoting Pretrial Conference, January 25, 2016, at 5-6).) The government pointed out that although DiTomasso had shown himself "well able to address the Court sua sponte on other occasions and in other conferences," he made "no argument" at that point to inform the court that Marcus could in any way be an important witness. (Rule 33 Motion H.Tr. 6.)

DiTomasso's new attorney, Ms. Cohen, argued at the hearing that DiTomasso's former counsel "ineffectively represent[ed] Mr. DiTomasso at the trial . . . . once Robert Marcus came to [DiTomasso's trial counsel] and *indicated* to him that he was the real perpetrator in this case" (Rule 33 Motion H.Tr. 2-3 (emphasis added)), but she conceded the district court's point that "that doesn't mean he confessed" (*id*. at 3; *see id*. ("MS. COHEN: No, it does not.")). And although defense counsel also argued that the case against DiTomasso "was substantially circumstantial" (*id*.), the court responded that the circumstantial evidence was "overwhelming" and that there was also "a fair amount of direct evidence" (*id*.; *see id*. at 4 ("MS. COHEN: I would

33

say, your Honor, the only direct evidence are *the video chats*. THE COURT: That would be the evidence I would be talking of." (emphasis added)).

After hearing additional argument, the court denied the motion, stating principally as follows:

> [A]n attorney's decision not to call a particular witness for tactical reasons does not satisfy the standard for ineffective assistance. . . .
>
> Thus, even if . . . Marcus had told Mr. Ginsberg that he was the guilty party and that his nephew was entirely innocent, the decision not to call Marcus would not establish ineffective assistance.
>
> In this case, though, there is substantial reason to question that those facts are accurate. First, Mr. Ginsberg, as an officer of the court, denies that Marcus told him that he, not the defendant, was the guilty party.
>
> Second, the undisputed facts tend to confirm that *neither Mr. Ginsberg nor Mr. DiTomasso believed that Marcus was a potential witness. The jail conversation* between DiTomasso and Marcus *confirms that defendant wanted* to pursue a strategy of pointing the finger at his uncle, *not that his uncle was prepared to state under oath that he had engaged in a very elaborate job of framing his nephew, but was now ready to testify and confess to the crimes.*
>
> Further, it is undisputable that Mr. DiTomasso raised many issues regarding his defense directly with Judge Scheindlin, but *when it came time to discuss whether there would be a defense case, he did not mention that his uncle had confessed to his attorney and should be called as a witness.* To the contrary, *he made clear that he, the defendant, was the only potential witness in his behalf.*

(Rule 33 Motion H.Tr. 13-14 (emphases added).)

34

The court also found it significant that when DiTomasso made his first posttrial complaint about Ginsberg's performance, in his May 2016 letter to the court, he "focused entirely on his view that an [Xbox] cannot do the things the trial witnesses said it did. That was the issue that he believed deprived him of a fair trial." (*Id*. at 14.) In that letter, DiTomasso "did not raise" any semblance of "his current claim that his lawyer was inept because he failed to call his [uncle] as a witness." (*Id*.)

The court thus properly concluded that Ginsberg's performance was not deficient, finding, without need for live testimony, (a) that Marcus's conclusory assertions--"I was the one who engaged in *the conduct*, not Frank" (Marcus Aff. ¶ 13 (emphasis added)), and "I told [DiTomasso's trial counsel] that I was the person *responsible for these crimes*, not Frank" (*id*. ¶ 15 (emphasis added))--did not constitute a confession; (b) that the record was replete with circumstantial evidence--in the telephone conversation between DiTomasso and Marcus, and in DiTomasso's statements to the court both shortly before and shortly after trial--supporting Ginsberg's declaration that Marcus had not told Ginsberg either that Marcus was guilty of the acts attributed to DiTomasso or that Marcus wanted to testify at DiTomasso's trial.

35

Rather, the record supports the conclusion that neither DiTomasso nor Marcus had any belief that Marcus was willing to testify at DiTomasso's trial to say that Marcus had performed all of the acts at issue. Indeed, even DiTomasso's new attorney apparently had no such belief. She stated:

> *I think their thinking was they would go to trial, Mr. DiTomasso would go to trial, and **if** he was acquitted, then fine, Mr. Marcus didn't have to get on the stand and admit his culpability. But once Mr.--**if** Mr. DiTomasso got convicted, **then** Mr. Marcus, the true perpetrator, would come forward . . . .*

(Rule 33 Motion H.Tr. 7-8 (emphases added).) Plainly a plan to have Marcus testify only "if" and "[w]hen" DiTomasso had been convicted showed no willingness by Marcus to testify at DiTomasso's trial.

There was no error in the district court's conclusion that DiTomasso could not establish that Ginsberg's not calling Marcus as a witness constituted deficient performance.

Nor was there error in the court's view that--even if Marcus had been a witness and testified in the manner suggested in his affirmation--there was no reasonable probability that the outcome of DiTomasso's trial would have been different. While there may be no reason to doubt Marcus's statement that "[w]hen" he "was in the First Avenue Apartment" he had "full access to [DiTomasso's] Xbox

and" DiTomasso's other devices and "accounts" (Marcus Aff. ¶¶ 10, 11), that fact could not exonerate DiTomasso. First, "full" access, is not the same as exclusive access. As the district court pointed out, the fact that Marcus may have engaged in child pornography activities does not mean that DiTomasso did not. (*See* Rule 33 Motion H.Tr. 3.) Second, even if Marcus had resided with DiTomasso full time, he could not know what DiTomasso was doing every minute of every hour of the day and night; Marcus's statement that "Frank" did "not" perform any of the acts with which he was charged was a conclusory statement the truth of which Marcus could not know. Further, DiTomasso's online communications with Sarah occurred between October 2012 and, at the latest, August 5, 2013. (*See*, *e.g.*, GX 706 (quoting conversations from October 3, 2012, through February 1, 2013, and a message from frankiepthc on August 5); *see also* Trial Tr. 202-04 (noting April 7, 2013 as the last date of child pornography sharing from Sarah's computer).) Marcus was in no position even to claim to know that DiTomasso did not perform the alleged acts during that period, for he did not "move[] into the First Avenue Apartment" until "November of 2013" (Marcus Aff. ¶ 9). And finally, Sarah and frankiepthc had extended Skype chats with video; in a photo array, Sarah identified DiTomasso as frankiepthc.

37

Thus, as the district court pointed out, even if in fact Marcus had planned to--and did--testify that he had performed the acts charged to DiTomasso, a flaw in the defense "premise" was "that either Mr. Marcus is guilty or Mr. DiTomasso is guilty, . . . ignor[ing] the possibility that they're both guilty" (Rule 33 Motion H.Tr. 3). DiTomasso's attorney responded that their argument was that having Marcus testify would have changed the outcome of the trial "whether they're both guilty or not." (*Id*.) Plainly, the court was not required to accept the premise that if both Marcus and DiTomasso were guilty, there was a reasonable probability that DiTomasso would not be found guilty.

In sum, we see no error in the district court's view that DiTomasso's claim of ineffective assistance of counsel did not satisfy either prong of the *Strickland* test. DiTomasso's contentions that he should have been granted a new trial in the interest of justice and that the court could not properly deny his motion without hearing live testimony are meritless.

## CONCLUSION

We have considered all of DiTomasso's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.